IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BETTY HOSKINS,<br><br>    Plaintiff,<br><br>    v.<br><br>BAYER CORPORATION AND BUSINESS SERVICES LONG TERM DISABILITY PLAN.,<br><br>    Defendant. | No. C 06-7589 MMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Docket Nos. 36, 37] |

## INTRODUCTION

Before the Court are (1) defendant Bayer Corporation Disability Plans' motion for summary judgment and (2) plaintiff Betty Hoskins' cross-motion for summary judgment, each brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] Having considered the papers filed in support of and in opposition to the motions, the Court hereby rules as follows.

## BACKGROUND

Plaintiff Betty Hoskins ("Hoskins" or "plaintiff") was employed by Bayer Corporation ("Bayer") as a janitorial worker beginning in August 1984. (See BA 267-68.)[2] Plaintiff was injured by a fall at work; her last date of employment was September 30, 2001. (See id.)

---

[1] As set forth below, the Court will construe the motions as motions for judgment under Rule 52.

[2] The record herein consists of the Administrator Record (BA 0001-0347) and a First Supplemental Disclosure (BA 0348-0460).

1  Plaintiff applied for long term disability ("LTD") benefits with the Bayer Corporation Disability
2  Plan ("the Plan" or "defendant") in March 2004.  (See id.; BA 75-85.)  During the period
3  between plaintiff's 2001 fall and her application for LTD benefits, she suffered from back
4  pain, saw Mark Miller, D.C. ("Dr. Miller"), a chiropractor, and received short term disability
5  benefits. (See, e.g., BA 177, 180, 189-215.) On May 21, 2004, Broadspire Administrator
6  Services, Inc. ("Broadspire"), the company handling claims administration for defendant,
7  approved plaintiff for LTD benefits.  (See BA 259-60.)  In the letter approving plaintiff for
8  benefits, Broadspire instructed plaintiff as follows: "To remain eligible for continued benefits
9  under the Long Term Disability Policy, it is necessary for you to be under the regular care
10 and attendance of a legally qualified physician.  Periodically, we will request updated
11 information about your medical condition.  Updated medical authorizations will also be
12 requested when needed."  (BA 260.)

13 On December 17, 2004, plaintiff participated in a Functional Capacity Evaluation
14 ("FCE") to determine her ability to return to active duty employment.  (See BA 30-50.)  The
15 FCE was administered by a Certified Work Capacity Evaluator, Steven Moon ("Moon"), of
16 Bay Area FCE.  (See BA 30.)  Among the conclusions set forth in the FCE were that
17 plaintiff "demonstrated the minimal ability to perform in a Sedentary level over an 8-hour
18 day" and that "[m]aximal strength levels, positional tolerances, limitations and
19 accommodations could not be clearly defined due to lack of participation, sub-maximal and
20 unreliable efforts, and symptom exaggeration behaviors." (BA 30.)

21 On April 8, 2005, Broadspire sent plaintiff a letter notifying her that Broadspire was
22 conducting a review of her claim to determine her continued eligibility for benefits.  (See BA
23 17-18.)  Broadspire explained that plaintiff must be under the regular care of a physician to
24 be eligible under the Plan, (see BA 17), and advised plaintiff that the medical data did not
25 support a determination that plaintiff was "under the regular care of a physician or disabled
26 from any occupation," (see BA 18).  Broadspire further explained that it was relying on the
27 results of the FCE, which indicated that plaintiff was capable of sedentary employment.
28 (See BA 17.)  Broadspire also informed plaintiff that it had contacted Dr. Miller, plaintiff's

1  "only physician of record,"[3] to ask his opinion as to the conclusion stated in the FCE, (see
2  BA 17), and that Dr. Miller responded that he had not seen plaintiff since August 2004 and
3  could not offer an opinion as to plaintiff's level of functionality, (see id.). The letter further
4  advised plaintiff that she had thirty days in which to submit information to show that she
5  was under the regular care of a physician and was disabled from any gainful occupation as
6  defined by the policy. (See BA 18.) Plaintiff was also advised that failure to comply could
7  result in the termination of her LTD benefits. (See id.)

8  On April 28, 2005 plaintiff called Broadspire and stated she was seeing Dr. Miller,
9  (see BA 334), at which time a Broadspire representative told plaintiff that she had to submit
10 documentation showing that she was under Dr. Miller's care, (see id.). On May 31, 2005,
11 plaintiff left a voicemail for Broadspire, stating that her Workers Compensation benefits
12 were discontinued as of May 1, 2005, and that Dr. Miller had sent in the required medical
13 information. (See BA 336.)

14 On June 1, 2005 Broadspire sent plaintiff another letter, setting forth therein their
15 previous communications with plaintiff and advising plaintiff that Broadspire had not yet
16 received any documentation showing plaintiff was under the care of a physician. (BA 157.)
17 Broadspire set a new date, extending the deadline to June 17, 2005, for plaintiff to submit
18 evidence of plaintiff's ongoing medical care, and again counseled plaintiff that her failure to
19 provide evidentiary support for her assertion of continuing treatment could result in the
20 termination of her LTD benefits. (See id.)

21 On July 8, 2005, Broadspire sent plaintiff a letter notifying her that her LTD benefits
22 would be terminated effective July 31, 2005. (See BA 13-15.) In addition to recounting
23 their communications over the previous months, including communications concerning an
24 overpayment and the effect thereon of plaintiff's Worker's Compensation benefit end date,
25 Broadspire explained that plaintiff's LTD benefits would be discontinued because
26 Broadspire had not yet received medical documentation evidencing plaintiff's continued
27 medical care or disability. (See BA 13-14.) Plaintiff was also advised of the appeal
28

---

[3]As noted above, Dr. Miller is a chiropractor, not a medical doctor.

3

process and instructed to provide both a written appeal and current medical documentation. (See BA 14.)

On August 18, 2005, plaintiff appealed the denial of her LTD benefits. (See BA 12.) The appeal consists of one handwritten page and concludes with the statement "I will inclose (sic) Doctors papers." (See id.)[4] Thereafter, in a short note dated September 19, 2005, Dr. Miller offered the opinion that plaintiff is "permanently totally disabled" due to a "very large disc herniation and subsequent sciatica neuralgia." (See BA 19.) On November 10, 2005, the Bayer ERISA Review Committee, after seeking and obtaining independent peer reviews of plaintiff's medical records by two physicians, Robert Ennis, M.D. ("Dr. Ennis"), (BA 54-56), and Charles S. Stone, M.D. ("Dr. Stone"), (BA 58-59), "upheld the cessation of [plaintiff's] benefits under the Plan." (BA 6-7 )

On December 12, 2006 plaintiff filed the instant action, seeking benefits, as well as prejudgment interest and attorney's fees.

## DISCUSSION

The Plan, in relevant part, provides:

a) Employee is "totally disabled" if he is wholly and continuously unable during the first two years of any one period of disability to perform any and every duty pertaining to his employment. During the remainder of such period of disability, the employee must be unable to engage in any occupation or perform any work for compensation or profit for which he is, or may become, reasonably fitted by training, education or experience.

b) An employee is not totally disabled during any period in which he is not under the regular care and attendance of a legally qualified physician or if he engages in any occupation or performs any work for compensation or profit.

(BA 363 ¶ 4.) The Plan further specifies that LTD benefits will "automatically" cease if, inter alia, the employee is "no longer under the regular care of a physician." (See BA 356.)

Defendant argues that its decision to deny LTD benefits is justified on two independent grounds: (1) plaintiff's failure to supply evidence of ongoing treatment by a physician, despite repeated requests that she do so; and (2) the absence in the record of evidence showing plaintiff was unable to engage in any occupation or to perform any

---

[4]Defendant asserts that plaintiff did not include any documents at that time, and the record contains no such documentation.

4

compensable work for which she was reasonably qualified.

Plaintiff contends that: (1) defendant abandoned the first ground when evidence of additional medical treatment was provided; and (2) the record does not support defendant's denial of benefits on the second ground. As to the latter contention, plaintiff argues that the protocol used to arrive at the conclusions in the FCE was flawed, that defendant did not create or maintain a complete record of plaintiff's medical reports, and that the peer reviews based on such record were thus incomplete and inaccurate.

**A.    Legal Standard**

On October 1, 2007 the Court denied plaintiff's request that the Court review de novo defendant's decision to terminate plaintiff's LTD benefits, and found the appropriate standard of review is abuse of discretion. (See Order Denying Plaintiff's Motion Re: Standard of Review, Docket No. 35.) In so ruling, the Court, citing Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955 (9th Cir. 2006), explained that it would "review defendant's decision regarding plaintiff's disability benefits for abuse of discretion, taking into consideration any evidence of conflict of interest and procedural irregularities." (Id. at 3.)

In Abatie, the Ninth Circuit held that where "the wording of the Plan confers discretion on the Plan administrator" and "the Plan administrator has a conflict of interest," an "abuse of discretion review, tempered by skepticism commensurate with the Plan administrator's conflict of interest, applies." See id. at 959. As the Ninth Circuit further observed, "an insurer that acts as both the Plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest." See id. at 965. Such "inherent conflict of interest, even if merely formal and unaccompanied by indicia of bad faith or self-dealing" requires an abuse of discretion review "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." Id. at 967. The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history." Id. at 968. Although "[t]he district court may, in its

5

discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest[,] the decision on the merits . . . must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." Id. at 970.

Subsequent to the Court's order determining the applicable standard of review, the United States Supreme Court issued its decision in Metropolitan Life Ins. Co. v. Glenn, --- S. Ct. ---, 2008 WL 2444796, setting forth therein the procedure to be followed by a reviewing court where "a plan administrator both evaluates claims for benefits and pays benefits claims." See id. at *5. In analyzing the issue, the Supreme Court held the standard of review remains deferential rather than de novo, see id. at *7, and that structural conflict is a "factor" to be "taken into account" along with any other relevant factors, see id. at *8. As the Supreme Court further explained, such conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration," and "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." See id. at *9.

This Court sees no inconsistency between the Ninth Circuit's holding in Abatie, on which this Court earlier relied, and the Supreme Court's recent decision in Metropolitan Life, and, accordingly, will proceed in accordance with this Court's order of October 1, 2007. Further, in light of Metropolitan Life and Abatie, the Court will construe the parties' respective motions for summary judgment as motions for judgment under Rule 52 of the Federal Rules of Civil Procedure, in order that the Court, in applying the proper standard of review under such authority, may weigh evidence relevant to any conflict of interest bearing on defendant's exercise of discretion.

### 1. Structural Conflict of Interest

Plaintiff argues that defendant has a structural conflict of interest because defendant pays LTD benefits, at least in part, from general company assets. (See Plf.'s Opp. at 1, 3.) In support thereof, plaintiff submits what she contends is a page from the Plan, which document, she states, she received during her employment with Bayer. (See Hoskins Decl. Ex. 1.) The page, titled "Administrative Information," is undated and states that LTD benefits are paid "from general company assets and trust." (Id.) In response, defendant asserts that no structural conflict exists because all LTD benefits are paid exclusively from a non-reversionary trust, (see Def.'s Reply at 2); in support thereof, defendant submits a copy of the trust agreement as well as the declaration of James K. Martin, Director of Capital Markets & Trust Investments, North America. (See Martin Decl. ¶ 1.) Martin attests that the trust is funded by periodic contributions from Bayer, and that proceeds from the trust are then used to pay employee welfare benefits, including those awarded under the Bayer Corporation Disabilities Plans. (See id. ¶ 3.) Martin further attests that Mellon Bank serves as the trustee, that the trust is used exclusively to pay employee welfare benefits to participants or beneficiaries, and that these procedures have been in place since at least January 1, 1992. (See id.)

In addition to the above-described factual dispute, the parties disagree as to the appropriate legal analysis. Defendant contends that a structural conflict does not exist for purposes of an ERISA disability claim when a plan pays benefits from a trust rather than from the sponsor's general assets. Plaintiff, on the other hand, contends that the sponsor's use of a trust, rather than payment directly from general assets, does not automatically obviate any potential conflict of interest. The parties cite to no Ninth Circuit authority expressly addressing whether the plan sponsor's use of a trust precludes a finding of structural conflict.[5]

---

[5] See, e.g., Lang v. Long-Term Disability Plain of Sponsor Applied Remote Technology, Inc., 125 F.3d, 794, 797 (9th Cir. 1997), (distinguishing Eleventh Circuit decision holding that "[b]ecause an insurance company pays out to beneficiaries from its own assets *rather than the assets of a trust*, its fiduciary role lies in perpetual conflict with its profit-making role as a business." (emphasis added).

The Court, however, need not resolve herein either of the above-referenced disputes. Rather, as discussed below, the Court, assuming, arguendo, the existence of a structural conflict, finds no reason to accord such conflict any significant weight, as plaintiff has failed to submit evidence demonstrating malice, self-dealing or a parsimonious claims-granting history on the part of defendant. See Metropolitan Life, --- S. Ct. ---, 2008 WL 2444796 at *9 (recognizing structural conflict ordinarily will be less important where administrator "has taken active steps to reduce potential bias"); Abatie, 458 F.3d at 969 (noting level of skepticism "may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, self-dealing, or of a parsimonious claims-granting history").

### 2. Factors Warranting Higher Level of Skepticism

In support of her argument that the Court should employ a high level of skepticism, plaintiff relies solely on defendant's conduct in determining the instant claim.

Plaintiff first argues that the protocol used in the December 17, 2004 FCE, established by VerNova, Inc., is unreliable. In that regard, plaintiff submits a declaration from Moon, the evaluator who performed the FCE, who attests that VerNova had, on an unspecified number of occasions, added comments and conclusions to his reports without his prior authorization, and that he had some concerns about whether the protocol in general had been properly validated. (See Moon Decl. ¶¶ 3-6.)[6] Defendant, in response, submits a supplemental declaration by Moon, in which Moon states he "do[es] not have any information or knowledge that VerNova did or did not alter or modif[y] any of [his] comments or statements" in the FCE report he prepared with respect to plaintiff, (Moon Supp. Dec. ¶ 4), nor does he "have any information which could lead [him] to state a different conclusion than that which is stated in the [FCE] report," (id. ¶ 5).

Even if plaintiff's evidence were sufficient, which it is not, to show the VerNova protocol was unreliable, there is no evidence that defendant had any knowledge of the

---

[6] Defendant raises various evidentiary objections to Moon's statements, which the Court hereby denies.

8

methodology used by VerNova, or any reason to question it.  Indeed, Moon concedes that he never contacted defendant or Bayer with regard to the Hoskins FCE or as to any concern he might have had relative to VerNova.  (Moon Supp. Decl. ¶ 6.)  Consequently, plaintiff has not shown that defendant was acting with malice or in its own self-interest by contracting with VerNova.

Plaintiff next argues that a number of medical reports and pages from various documents "never made it into the file." (Plf.'s Motion at 5.)  Plaintiff does not, however, submit evidence showing what information any such assertedly missing documents contained, nor does she submit any evidence that such documents are missing because of any conduct on the part of defendant.  Consequently, plaintiff again fails to establish that defendant was self-dealing or otherwise acting in bad faith.

Finally, plaintiff argues that defendant failed to request and obtain her medical records from the Social Security Administration ("SSA") and her Worker's Compensation ("WC") claim file, which, plaintiff asserts, would have allowed for inferences that plaintiff was disabled and was under the regular care of medical practitioners.  In creating the record, a plan administrator must engage in a "meaningful dialogue" with the claimant, and "if the plan administrator[ ] believe[s] that more information is needed to make a reasoned decision, they must ask for it." See Booton v. Lockheed Medical Benefit Plan, 110 F.3d 1461, 1463 (9th Cir. 1997); see also Saffon v. Wells Fargo Company Long Term Disability Plan, 522 F.3d 863, 870 (9th Cir. 2008) (reversing judgment in favor of insurer; noting insurer had failed to explain to claimant "in a manner calculated to be understood by the claimant" what "[claimant] must do to perfect her claim") (internal quotation and citation omitted).  Here, however, Broadspire, on three separate occasions, informed plaintiff as to the information it needed.  These communications were sufficient to put plaintiff on notice as to what plaintiff needed to do to maintain her LTD benefits; if the Social Security and Workers Compensation records supported plaintiff's claim, she was on notice that she needed to provide them.

Moreover, even if defendant had received the relevant documents directly from the

9

above-referenced agencies, plaintiff has not shown how these documents would have changed the outcome.  Plaintiff's only proffer with respect to the SSA records is her own assertion, without evidentiary support, that the SSA found her to be permanently, totally disabled. (See Plf.'s Reply at 2.)  Further, even assuming the SSA's records were consistent with plaintiff's description, defendant would not be bound by any such determination.  See Madden v. ITT Long Term Disability Plan, 914 F.2d 1279, 1283-86 (9th Cir. 1990) (holding plan fiduciary did not abuse discretion in crediting medical evidence in record showing lack of disability notwithstanding social security award in favor of claimant); see also Wallace v. Intel Corp., 2005 U.S.  Dist. LEXIS 32515, at *25-28 (D. Az. 2005) (holding plan fiduciary need not consider SSA findings; further holding no inference of conflict to be drawn from failure to consider such findings).  With respect to her WC claim, plaintiff states, and provides some evidentiary support for, the WC insurance company's payment to her of a lump-sum settlement award based upon a "33% partial disability," (see Plf.'s Motion at 5:6-7; BA 261), not a total disability. Finally, although plaintiff argues that the WC documents could have shown she received medical treatment during the relevant time period, plaintiff fails to specify the nature or dates of any such medical care, nor does she otherwise describe the content of the WC records to which she refers.  (See Plf.'s Reply at 2.)  Consequently, plaintiff has failed to demonstrate that defendant's failure to request records directly from the SSA or WC claims file supports an inference of self-dealing.

In sum, the Court assumes, arguendo, the existence of a structural conflict of interest and applies an analysis using the abuse of discretion standard, with a low amount of skepticism.  The Court next turns to the merits of Plaintiff's claim.

//
//
//
//
//

10

1    **B.    Defendant's Exercise of Discretion**

2            **1.    Defendant's Finding That Plaintiff Was Not Under Regular Care of Physician**

4    "An ERISA administrator abuses its discretion only if it (1) renders a decision without
5    explanation, (2) construes provisions of the plan in a way that conflicts with the plain
6    language of the plan or (3) relies on clearly erroneous findings of fact." See Boyd v. Bell,
7    410 F.3d 1173, 1178 (9th Cir. 2005).

8            Here, defendant, in denying plaintiff's claim for continued LTD benefits, relies on
9    plaintiff's failure to submit documentation of ongoing medical care. As noted, plaintiff, at
10   the outset, contends defendant abandoned this reason once the relevant documentation
11   had been provided. The record, however, contains no evidence of such asserted
12   abandonment. Plaintiff next argues that defendant misconstrues the Plan language and
13   relies on erroneous findings of fact. Accordingly, the Court next reviews the record to
14   determine whether defendant abused its discretion in finding plaintiff was not under the
15   regular care of a physician.

16           In making such determination, the Court starts with the Plan language, which, as
17   noted, provides that employees receiving LTD benefits are "automatically" disqualified if
18   they are not "under the regular care and attendance" of a physician. (See BA 356, 363)
19   The plan contains no definition of "regular," and, accordingly, the Court will give the term its
20   ordinary meaning. In that regard, courts generally look first to the frequency of the
21   claimant's medical visits. See, e.g., Eichacker v. The Paul Revere Life Ins. Co., 354 F.3d
22   1142, 1148 (9th Cir. 2004) (citing cases holding claimants failed to meet "physician's care"
23   requirement where claimants "were not receiving any physician's care whatsoever during
24   the period in dispute"); Rowan v. Unum Life Ins. Co. of America, 119 F.3d 433, 437 (6th
25   Cir. 1997) (reversing summary judgment in favor of plaintiff; holding "fact that plaintiff did
26   not have contact with a physician with respect to her back condition for over eleven months
27   prior to the termination of her benefits is sufficient to raise a question of fact as to whether
28   or not she was under the regular attendance of a physician during that time"). "Other

1 relevant factors, to the extent they are revealed by the administrative record, may include 2 the plaintiff's condition at the time of her last doctor's visit, the likelihood that additional 3 doctor visits would have influenced the progression of her disability, whether or not the 4 plaintiff was taking medication or engaging in physical therapy or exercises recommended 5 by her doctor, and the need for a physician to directly monitor such activities in the normal 6 course of treatment." See id.

7 In the instant case, the record reflects that defendant approved plaintiff for LTD 8 benefits on May 21, 2004 and discontinued plaintiff's LTD benefits on July 31, 2005. The 9 documentation regarding plaintiff's receipt of medical care during that fourteen-month 10 period consists of the following: (1) an unsigned and undated form titled "Attending 11 Physician's Statement," stating plaintiff was last seen by a physician on July 29, 2004, (BA 12 269); (2) notes in a Broadspire "Chronolog" indicating plaintiff cancelled a November 2004 13 FCE "due to 3 hospitalizations," and that when Broadspire followed up with a call to plaintiff, 14 plaintiff reported she had gone to the emergency room on November 2 and 3 because of a 15 "nose bleed," (BA 328); (3) a handwritten note from Dr. Miller, dated September 19, 2005, 16 stating plaintiff is "permanently totally disabled," (BA 19).[7] The Court, as set forth below, 17 finds that on this record defendant did not abuse its discretion in determining plaintiff was 18 not under the "regular care and attendance" of a physician during the relevant time period.

19 First, the July 2004 document, consisting of the first page of a Broadspire form 20 request for information,[8] indicates plaintiff last saw a physician for her claimed disabling 21 condition in late July 2004. (BA 269.) The form further indicates plaintiff previously was 22 being seen on a "bi-monthly" basis, (id.), and there is no indication her condition, if in fact 23 still disabling, would no longer benefit from such care. Plaintiff's report of her subsequent 24 "hospitalizations" in November 2004 does not suggest plaintiff thereafter did receive care

---

[7] The only other record for the year 2004 is an "Attending Physician's Statement" signed by Dr. Miller and dated March 10, 2004, in which Dr. Miller states he last saw plaintiff on that date and had been seeing her on a monthly basis up to that point. (See BA 265-266.)

[8] The document bears a handwritten notation at the top: "Rec'd One Page Only." (See id.)

12

1  for her back condition.  At least two of the hospital visits were for nose bleeds, and there is
2  no record of the third.  (See BA 328).  Lastly, Dr. Miller's September 19, 2005 note,
3  submitted after the termination of plaintiff's LTD benefits, reveals nothing with respect to
4  plaintiff's receipt of medical care.  (See BA 19.)  Indeed, in response to Broadspire's follow-
5  up to the FCE, Dr. Miller reported he had not seen plaintiff since August 2004. (See BA 17.)

7  Accordingly, the record does not reflect that plaintiff received any, let alone "regular",
8  medical care for her disabling condition after July 29, 2004, a full year before defendant
9  terminated her benefits, and, indeed, plaintiff does not identify herein any medical care she
10  received beyond that discussed above.
11  Even viewing defendant's decision with some degree of skepticism, the Court cannot
12  find that defendant's interpretation of the "regular care" provision is inconsistent with the
13  language of the Plan or that defendant relied on factual findings unsupported by substantial
14  evidence.  In sum, the Court finds defendant's determination that plaintiff had failed to meet
15  the "regular care" requirement did not constitute an abuse of discretion, and, accordingly,
16  defendant is entitled to judgment on plaintiff's claim for benefits.

17  **2.    Defendant's Finding That Plaintiff Was Not Totally Disabled**

18  Defendant terminated plaintiff's LTD benefits for the additional reason that the record
19  did not support a finding that plaintiff was totally disabled.  As discussed below, the Court
20  finds defendant's decision to terminate plaintiff's LTD benefits on this ground, even when
21  viewed with skepticism, was not an abuse of discretion.
22  The record contains numerous documents reflecting plaintiff's diagnosis of sciatica
23  and other related back problems over the years, as well as her medical treatment for that
24  condition.  (See, e.g., BA 177, 189, 191, 193, 204, 206, 208, 269.)  The issue presented
25  herein, however, is not whether plaintiff had a disabling back condition at some point but
26  whether defendant abused its discretion in finding plaintiff was not totally disabled in July
27  2005.  See, e.g., Jordan v. Northrop Grumman, 370 F.3d 869, 880 (9th Cir. 2004) ("That a
28  person has a true medical diagnosis does not itself establish disability.") In resolving this

issue, the Court is not free to substitute its judgment for that of the plan administrator, and may set aside the plan administrator's decision only when it is arbitrary and capricious. See id. at 875. Although, as noted, a decision to deny benefits cannot be arbitrary, the administrator need only provide "a reasonable basis for concluding that the medical condition was not disabling." Id. at 879. The Court thus looks to the record to determine whether there is a reasonable basis for defendant's conclusion that plaintiff was not totally disabled.

In defendant's July 8, 2005 letter informing plaintiff of the termination of her LTD benefits as of the end of that month, defendant stated it was lacking medical documentation that supported plaintiff's disability status. (See BA 14.) Defendant based that assessment on Dr. Miller's statement that he had not treated plaintiff since August 2004, the FCE in which plaintiff was found capable of a sedentary level of employment, and the lack of any further documentation of plaintiff's continuing care and current condition, despite defendant's repeated requests for such documentation. (Id.) Thereafter, when plaintiff appealed the termination of her benefits, defendant requested two separate peer reviews of plaintiff's file, and ultimately upheld the termination. Upon review of the record, the Court finds defendant did not abuse its discretion in either the manner in which it conducted its evaluation or in its ultimate determination.

The Court turns first to the FCE, administered December 14, 2004. (See BA 30-50.) Based on his testing, Moon determined plaintiff was capable of returning to active employment at a "Sedentary Level over an 8-hour day." (See BA 30). Moon further noted that plaintiff's ability to do more could not be determined in light of plaintiff's "lack of participation, sub-maximal and unreliable efforts, and symptom exaggeration behaviors." (BA 30.) Other than plaintiff's unsupported contention that the protocol used in conducting the FCE was faulty, plaintiff points to nothing to suggest the conclusions reached therein should not be credited.

By contrast, the most recent Attending Physician's Statement was submitted without an opinion as to plaintiff's ability to perform work. Although the last Attending Physician's

1  Statement prepared prior to that date, completed by Dr. Miller on March 11, 2004, stated
2  plaintiff should not "lift, sit, [or] stand for any length of time," and described plaintiff's
3  prognosis as "poor to guarded," (BA 266), that form was completed nine months prior to the
4  FCE and over 16 months prior to the termination of plaintiff's LTD benefits.

   The September 19, 2005 note from Dr. Miller, received after defendant terminated
6  plaintiff's benefits, (BA 19), provides no information about Dr. Miller's then current
7  relationship with plaintiff, if any, or the basis for his opinion.  A plan administrator need not
8  accord special deference to conclusory medical opinions even if offered by a treating
9  physician.  See Jordan, 370 F.3d at 875; see also Magallanes v. Bowen, 881 F.2d 747, 751
10 (9th Cir. 1989) (holding, in context of application for social security benefits, fact-finder
11 "need not accept a treating physician's opinion which is brief and conclusory in form with
12 little in the way of clinical findings to support its conclusion") (internal quotation and citation
13 omitted).  Further, defendant had been advised earlier that Dr. Miller had not seen plaintiff
14 since August 2004, more than a year prior to the time he wrote the above-referenced note.
15 (BA 17.)

   Under the circumstances presented, defendant did not abuse its discretion in relying
17 on the FCE, which represented a current evaluation of plaintiff's capacity to work, as well
18 as the two separate peer reviews thereafter performed, respectively, by Dr. Ennis, (See BA
19 54-56), and Dr. Stone, (See BA 58-59), both of whom were of the opinion that plaintiff's
20 medical records did not support a finding that she was incapable of performing work for
21 which she was qualified.  (See BA 56, 59).

   Although plaintiff contends the peer reviews are unreliable because neither doctor
23 was provided with a copy of reports of radiological and neurological tests referenced in
24 progress reports from Dr. Miller in 2001 and 2002, plaintiff has not offered copies of the
25 reports, nor is there anything in the record demonstrating how evidence of plaintiff's
26 condition in 2001 and 2002 would bear on an evaluation of plaintiff's condition several
27 years later.  Indeed, in their respective reviews, both Drs. Ennis and Stone indicate they
28 were aware of the results of the radiological and neurodiagnostic tests.  (See, e.g., BA 56

(relating findings in 2002 MRI report and of neurodiagnostic testing); BA 59 (relating results of 2002 MRI and of neurodiagnostic testing).) Consequently, irrespective of whether the reports themselves were available, there is no indication that reading the reports themselves would have significantly affected either doctor's conclusions. Finally, as discussed above, the record reflects that in 2005 defendant repeatedly asked plaintiff to submit specific medical findings showing her current physical disabilities and limitations, and that plaintiff failed to do so. See, e.g., LaPrease v. Unum Life Ins. Co. of America, 347 F.Supp. 2d 944, 955 (W.D. Wash. 2004) (granting summary judgment in favor of disability insurer; noting independent medical practitioners who reviewed claimant's file at insurer's request "did not conclude [claimant's] physicians were incorrect, but found that there was not enough evidence to support their conclusion that he was disabled").

In sum, the Court finds defendant's determination that plaintiff was not totally disabled did not constitute an abuse of discretion, and, accordingly, defendant, for such additional reason, is entitled to judgment on plaintiff's claim for benefits.

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment is hereby GRANTED and plaintiff's motion for judgment is hereby DENIED.

**IT IS SO ORDERED.**

Dated: June 25, 2008

MAXINE M. CHESNEY
United States District Judge